UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>   Plaintiff,<br><br>   v.<br><br>**WORLDWIDE EXECUTIVE JOB SEARCH SOLUTIONS, LLC,** a limited liability company, also d/b/a WWEJSS, Seven Figure Careers, 7FigRecruiters, 7FC, Finnburg Switzer, ResumeterPro, Creating Job Opportunity, Confidential Jobs Only, CJOnly, and CJO Private Equity,<br><br>**PRIVATEEQUITYHEADHUNTERS.COM, LLC,** a limited liability company, also d/b/a Private Equity Headhunters, PE Headhunters, and PEHHS.COM, LLC,<br><br>and<br><br>**CRAIG NICHOLAS CHREST,** individually and as a managing member of Worldwide Executive Job Search Solutions, LLC,<br><br>   Defendants. | Civil Action No. 4:19-cv-495 |

**COMPLAINT FOR PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and

1

Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's trade regulation rule entitled Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the

refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), and 6105(b).

## DEFENDANTS

6. Defendant Worldwide Executive Job Search Solutions, LLC ("Worldwide"), also doing business as WWEJSS, Seven Figure Careers, 7FigRecruiters, 7FC, Finnburg Switzer, ResumeterPro, Creating Job Opportunity, Confidential Jobs Only, CJOnly, and CJO Private Equity, is a Texas limited liability company with its principal place of business at Craig Chrest's residence in Houston, Texas. Worldwide transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Worldwide has advertised, marketed, promoted, or sold purported executive job placement services to consumers throughout the United States.

7. Defendant PrivateEquityHeadhunters.com, LLC ("PE Headhunters"), also doing business as Private Equity Headhunters, PE Headhunters, and PEHHS.COM, LLC, is a Texas limited liability company with its principal place of business at Craig Chrest's residence in Houston, Texas. PE Headhunters is owned and controlled by Worldwide. PE Headhunters transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, PE Headhunters has advertised, marketed, promoted, or sold purported executive job placement services and resume repair services to consumers throughout the United States.

8. Defendant Craig Nicholas Chrest ("Chrest") is the sole managing member of Worldwide, which is the managing member of PE Headhunters. At all times material to this Complaint, acting alone or in concert with others, Chrest has formulated, directed, controlled,

had the authority to control, or participated in the acts and practices of Worldwide and PE Headhunters, including the acts or practices set forth in the Complaint. Defendant Chrest resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

9.  Defendants Worldwide and PE Headhunters (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices in violation of Section 5 of the FTC Act and the TSR, as alleged below. Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations, and have also commingled funds. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendant Chrest has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

10. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

11. Defendants Worldwide, PE Headhunters, and Chrest are sellers or telemarketers that promote purported job placement and resume repair services to consumers nationwide using

4

inbound and outbound telephone calls and electronic communications. As detailed below, since at least 2014, Defendants have deceptively advertised, marketed, promoted, and sold bogus job placement and resume repair services, duping consumers out of millions of dollars.

*Defendants' Deceptive Job Opportunity Scheme*

12. Defendants use social media platforms like LinkedIn to identify consumers with marketing, business, or management experience. Defendants send unsolicited emails or messages through networking websites to consumers and represent that the consumer's work experience qualifies the consumer for an unadvertised executive or managerial job that pays a substantial salary. Defendants provide their contact information and invite consumers to contact them if they are interested in a lucrative job opportunity.

13. Consumers interested in the job opportunity respond to Defendants' solicitations by return email, by telephone, or by completing a "contact us" form on the Defendants' website and waiting for a return call. Many consumers also use information contained in Defendants' solicitations to research Defendants by finding Defendants' websites and press releases online.

14. On their websites, Defendants claim to offer job placement services in the private equity and venture capital ("PE/VC") industries for high paying jobs. They also claim to have inside connections to hidden jobs, and high success, interview, and placement rates. For example, in April 2015, Defendants, on their website www.sevenfigurecareers.com, claimed to have 25 years of experience in the high-salary recruiting industry. They also claimed that they had a 100% interview rate, and a placement rate between 86% and 90%. Through the website, Defendants claimed to know how and where to find hidden high-end jobs and that, by hiring Defendants, consumers could save an average of 119 days off of their job searches. Defendants

claimed to have exclusive relationships with 400 PE/VC firms and to utilize a network of over 2,400 executive recruiters around the United States working together to place clients in high-paying executive jobs. Defendants' "Who We Are" webpage, www.sevenfigurecareers.com /whoweare, contained the following chart:

> Our accomplishments in the venture capital industry include:
>
> • A current list of more than 600 deals that are seeking leadership
>
> • Nearly 100 positions that are actively seeking an executive
>
> • Relationships with more than 1,600 firms in the venture capital sector, including relationships with over 400 of these firms that are exclusive
>
> • More than 300 matches and more than 100 successful placements in the last year
>
> • Meeting all your recruiting needs after you have been successfully placed
>
> • Operating with more than 400 PE/VC firms, including the top three in the industry, as the "go to" recruiters
>
> • Success even throughout the economic slowdown. Our relationship-dependent business model guarantees fast results, and as soon as we place an executive who then requires further staffing, we return the retainer within three weeks' time.

www.sevenfigurecareers.com /whoweare, (April 23, 2015).

15. Almost identical charts and representations were included in Defendants' websites until at least in 2016. For example, Defendants' 2015 website, www.sevenfigurecareers.com, and Defendants' 2016 website, www.7figrecruiting.com, both touted the same success statistics: a 100% interview rate, an 86-90% job placement rate, and a time savings to consumers of 119 days off of their job searches. Likewise, Defendants' 2016 website, www.7figrecruiting.com, had an accomplishment chart identical to its 2015 website:

> **Our accomplishments in the venture capital industry include:**
>
> • A current list of more than 600 deals that are seeking leadership
> • Nearly 100 positions that are actively seeking an executive
> • Relationships with more than 1,600 firms in the venture capital sector, including relationships with over 400 of these firms that are exclusive
> • More than 300 matches and more than 100 successful placements in the last year
> • Meeting all your recruiting needs after you have been successfully placed
> • Operating with more than 400 PE/VC firms, including the top three in the industry, as the "go to" recruiters
> • Success even throughout the economic slowdown. Our relationship-dependent business model guarantees fast results, and as soon as we place an executive who then requires further staffing, we return the retainer within three weeks' time.

www.7figrecruiting.com/WHOWEARE (Jan. 14, 2016).

16. As of September 2018, Defendants' website www.exx20171.com claims that "When it comes to placing clients in jobs in the private equity venture capital space there is simply no match for CJO. . . . We are a group of executive recruiters who over many years have identified hundreds of hiring managers and convinced them to interview our candidates. Now we will do the same for you. When your skills match the requirements of the position we find for you, we will get you interviewed, guaranteed."

17. In numerous online press releases, Defendants similarly claimed to place consumers in high paying jobs and claimed to be recruiting for a large number of high-paying jobs. For example:

    a) In a press release dated December 1, 2015, Defendants claimed to have 71 executive positions to be filled by the end of the year and to have had an average annual salary of $477,000 in 2015 for executive and management positions filled though www.SevenFigureCareers.Com. Defendants also claimed to have direct special

7

relationships with over 400 PE/VC firms, including Agile Capital, Rock Hill Capital, Briar Cliff Solutions, A.G. Becker, and Argo LLC.

      b)      In a press release dated December 22, 2015, Defendants made nearly identical representations as on December 1, but claimed to have 96 executive positions to fill. Defendants also claimed to have received 35 employment offers for clients since December 1, 2015.

      c)      In a June 27, 2016 press release, Defendants made similar representations, but claimed to have 112 high-paying executive opportunities available and to have placed 165 executives in the PE/VC industries in 2015.

18.      Consumers who are interested in the high-paying executive or management job opportunities offered by Defendants typically exchange several telephone calls and emails with Defendants. In these communications, Defendants represent that they have access to unadvertised jobs and have been engaged to find an executive for a potential job or employer, or are a part of a large employment network. Defendants usually claim to be filling a particular job for a PE/VC firm that matches the consumer's skill or experience.

19.      Defendants usually require consumers to sign a non-disclosure agreement (NDA) prior to disclosing details of the potential job or employer. When explaining the reason for the NDA, Defendants frequently claim the entire application process is confidential, including the name and industry of the employer and the reason the position is available.

20.      After consumers sign the NDA, Defendants provide consumers more information about the job, the employer, or both. Defendants frequently copy consumers on an email chain that purports to include communications between Defendants and the potential employer's hiring

partner. This email chain usually contains the name of the purported employer and its web address, as well as the purported hiring partner's name and email. This email chain typically appears to show that the consumer is a top candidate for the potential job. In most instances, the position is purported to be near the consumer's hometown.

21. When consumers learn the name of the purported potential employer, they often seek to learn more information about it and frequently look up and review the company's website.

22. Typically, the potential employer's website contains cursory information, including a short description of the size and nature of the company, its targeted business areas, contact information, and the names of its principals – which often includes the name of the hiring partner identified by Defendants.

23. To move forward with job placement services or to obtain an interview with the potential employer, Defendants require consumers to pay an advance recruiting fee, which ranges between $1,200 and $2,500. Defendants often reassure consumers that they are a top candidate for the potential job.

24. Either as a part of the NDA, or as a part of the payment process, Defendants usually require consumers to sign contracts. Defendants' contracts frequently include a provision for Defendants to provide consumers one month of job placement services.

25. If consumers pay the advance fee, Defendants usually arrange a telephone interview with a person whom Defendants represent is the employer's hiring partner. On numerous occasions, these interviews are purportedly with Agile Capital, Rock Hill Capital, or Sienna Ventures.

26. After a telephone interview, Defendants usually tell consumers they did not get the position. Often, Defendants tell consumers that the employer had a change of business plans and opted not to hire an executive or manager at this time.

27. Subsequently, Defendants claim to provide additional job placement services for the consumer. Defendants send consumers a weekly email summarizing the work Defendants purportedly performed on the consumer's behalf. At the end of job placement services contracts, Defendants sometimes offer consumers additional job placement services for more money.

28. In truth and in fact, in almost all instances, consumers do not obtain a high-paying executive or management job because there is no potential job, the job interview is a charade, and Defendants have not been engaged by an employer to fill job openings that match consumers' experiences or resumes. Indeed, Defendants do not have special relationships with, and do not serve as the "go-to recruiter" for, 400 PE/VC firms, as claimed in their websites, press releases, and sales solicitations.

29. In many instances, the potential employer does not exist but is a shell entity established and controlled by Defendants. For example, Defendants have established or controlled websites or created press releases for the purported PE/VC firms Briar Cliff Solutions, Sienna Ventures, Asenquavc, and A.G. Becker. However, there were no PE/VC firms with these names existing or operating during the timeframes when Defendants claimed to have established relationships with them.

30. In other instances, the potential employer identified by Defendants is a real company. However, Defendants do not have any relationship or affiliation with that company, and the purported job and the alleged hiring partner do not exist.

*Defendants' Deceptive Resume Repair Services Scheme*

31. Since at least 2016, Defendants have similarly used deception to sell purported resume repair services.

32. After contacting consumers and enticing them with the likelihood of a potential lucrative job, as described above, Defendants sometimes ask for a copy of the consumer's resume and then inform the consumer that the resume is deficient.

33. Defendants frequently claim the consumer's resume cannot be scanned by industry resume scoring software and then claim that this defect is likely to prevent the consumer from being considered for the job. Defendants tell the consumer that he or she is otherwise a strong candidate for the job and is likely to obtain a job interview if the resume is repaired.

34. Defendants offer either to repair consumers' resumes for a fee of up to $1,200 or refer consumers to another company to do so. Defendants provide the Internet address of the recommended company, which also charges a large fee. However, in many instances, the website recommended by the Defendants is also registered and controlled by Defendants.

35. In truth and in fact, Defendants' resume repair service is another stream of revenue in their job opportunity scheme. In almost all instances, consumers who use Defendants' resume repair services are not candidates for a high-paying executive or management job and are not likely to obtain employment even if the resume is repaired.

36. Defendants' deceptive executive job opportunity schemes have frequently garnered negative media attention from business media and consumer watchdog organizations.

37. Defendants have frequently shut down their operations and re-opened similar operations using new assumed names, websites, or aliases. For example, Defendants have

operated a series of websites over the years: www.PrivateEquityHeadhunters.com (2014); www.PEHHS.com (2014); www.sevenfigurecareers.com (2015); www.7figrecruiters.com, www.FinnbergSwitzer.com, and www.resumeterpro.com (2016); and www.exx20171.com (2017-2018). In 2017 and 2018, Defendants' website has used numerous assumed names, including CJOnly and CJO Private Equity.

38. Defendants' deceptive executive job placement and resume repair schemes have injured consumers nationwide.

## VIOLATIONS OF THE FTC ACT

39. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

40. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### COUNT I: Deceptive Marketing of Purported Job Placement Services

41. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or the sale of job placement or resume repair services, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a) Defendants are recruiting for a highly paid executive position with a private equity or venture capital firm; and

    b) Consumers who purchase Defendants' services are likely to obtain a highly paid executive position with a private equity or venture capital firm through Defendants' assistance.

42. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 41 of this Complaint:

    a) Defendants are not recruiting for a highly paid executive position with a private equity or venture capital firm; and

    b) Consumers who purchase Defendants' services are not likely to obtain a highly paid executive position with a private equity or venture capital firm through Defendants' assistance.

43. Therefore, Defendants' representations as set forth in Paragraph 41 of this Complaint are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

44. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C. F. R. Part 310.

45. Defendants are "sellers" or "telemarketers" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2 (dd), (ff), and (gg).

46. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).

47. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT II: Misrepresenting the Provision of Purported Job Placement Services

48. In numerous instances, in connection with the telemarketing of job placement services, Defendants have misrepresented, directly or by implication, that:

    a) Defendants are recruiting for a highly paid executive position with a private equity or venture capital firm; and

    b) Consumers who purchase Defendants' services are likely to obtain a highly paid executive position with a private equity or venture capital firm through Defendants' assistance.

49. Defendants' misrepresentations as alleged in Paragraph 48 are deceptive telemarketing practices that violate Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

### CONSUMER INJURY

50. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

51.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

52.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money. This Court, in the exercise of its equitable jurisdiction, may award ancillary relief to prevent and remedy any violation of the TSR and the FTC Act.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Sections 310.3(a)(2)(iii) and (vii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii) and (vii), and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, temporary and preliminary injunctions, and an order freezing assets;

B. Enter a permanent injunction to prevent future violations of the FTC Act and the Telemarketing Sales Rule by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

 Respectfully submitted,

 ALDEN F. ABBOTT,
 GENERAL COUNSEL

Dated: February 13, 2019

/S/ Eric N Roberson
_____
ERIC N. ROBERSON
Attorney in Charge
Texas Bar #00792803
S.D. Texas Bar # 20890
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
eroberson@ftc.gov
Direct: (214) 979-9362
Facsimile: (214) 953-3079

Attorney for Plaintiff
FEDERAL TRADE COMMISSION